United States District Court
Southern District of Texas
**ENTERED**
February 09, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| Calvin Williams, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § § | Case No. 4:21-cv-1442 |
| Hyster-Yale Group f/k/a NACCO Industries, Inc. d/b/a Hyster, | § § § | |
| *Defendant.* | § | |

## <u>MEMORANDUM AND RECOMMENDATION</u>

Defendant Hyster-Yale Group (Hyster) has filed a motion to exclude the expert opinions of Dr. Richard Ziernicki, Dkt. 41, and a motion for summary judgment on Plaintiff Calvin Williams's claims, Dkt. 42.  After carefully considering the motions, Williams's responses, Dkt. 45, 50, Hyster's reply, Dkt. 53, and the applicable law, it is recommended that Hyster's motion to exclude Dr. Ziernicki's opinions (Dkt. 41) regarding causation and failure to warn be granted.  It is further recommended that Hyster's motion for summary judgment (Dkt. 42) be granted.

## <u>Background</u>

In March 2019, Williams underwent training to become a certified forklift operator.  *See* Dkt. 42-1 at 6-7; Dkt. 50-6 at 1-2.  A few days later, while

operating a Hyster model forklift for his employer Katoen Natie ("KTN"), he suffered a serious hand crush injury.  Dkt 50-6 at 11-13.

### A.     The forklift

The accident occurred while Williams was operating a Hyster Sit-down Counterbalance forklift, model S50FT Fortis.  Dkt. 50-2 at 7 (PX-B).  KTN purchased the forklift from Hyster in 2016.  *Id*. at 8.  The forklift has a cage with four posts surrounding the seat in which the driver sits and a large propane tank behind the seat:



Dkt. 50-6 at 8 (PX-F).

Operators of forklifts often need to drive in reverse.  When doing so, they are cautioned to "[l]ook in the direction of travel."  *See* Dkt. 41-6 at 10 (DX-F).  To maintain a proper lookout, an operator must rotate his body to watch behind

him while keeping a hand on the steering wheel.  Dkt. 50-5 at 67.  And to remain in that position, operators naturally tend to grasp something in the back of the forklift.  *See id.* at 74.

To that end, Hyster sells a rear drive handle with horn button, advertised as a "secure location for the operator's right hand when driving in reverse that is inboard of the truck for impact protection."  Dkt. 50-3 (PX-C).  This is depicted in Hyster's brochure:



Dkt. 50-2 at 20 (cropped photo of similar Hyster forklift).  Hyster sells the handle for $150 as an optional accessory, though it costs between $7 to $9 to manufacture.  Dkt. 50-4 at 31, 38 (PX-D).  For models sold in Europe, Hyster includes the handle as a standard feature.  *See id.* at 55-56.  But it was not included on the forklift that KTN purchased.  *See* Dkt. 50-2 at 9; Dkt. 50-6 at 43-44, 47, 52-61.

**B.      The accident**

The parties dispute the details leading up to the collision.  Williams contends he was holding the rear post.  Hyster, on the other hand, asserts that Williams had extended his appendage outside the driver's cage of the forklift. But generally, the parties agree that Williams was driving the forklift in reverse when his hand was crushed between the right rear post and a stack of plywood.  The force of this collision mangled Williams's right hand, requiring the amputation of two fingers.  *See* Dkt. 50-6 at 11.

KTN investigated the accident and detailed its findings in a 67-page incident report (the "KTN Report").  *See id*.  The KTN Report concluded that Williams had been holding the right-rear post of the forklift while driving in reverse when he collided with the plywood:



**March 2019**

**FACTS:** Forklift operator was traveling in reverse in the main shipping and receiving area while holding on the outside cage of his forklift with his right hand, when he crushed his fingers against plywood sitting on top of a pallet.

KTN0065

*Id.* at 65.

Industry regulations caution operators to avoid holding onto the exterior of the forklift while driving in reverse.  *See e.g.*, Dkt. 41-6 at 10 ("Do not grab the overhead guard when traveling in reverse. This could expose the operator's finger to serious injury.").  But Williams testified that his only option was to grab the rear post because the forklift had a hot propone tank behind his seat, and no rear-drive handle was installed.  Dkt. 50-8 at 2-3 (PX-H).

The KTN Report also contains a handwritten memo from fellow KTN employee Severo Garcia.  Dkt. 50-6 at 62.  Garcia was passing by when the accident occurred.  *Id.*  According to Garcia's memo, he had seen Williams with "his arm & hand ... in a raise[d] position extended outside of [the] operator cage confin[e]ment when he impacted" the plywood.  *Id.*  There are no other eyewitness accounts.  No one has been able to locate Garcia, who is believed to be deceased.  *See* Dkt. 50 at 15 & n.6.

### C.   Dr. Ziernicki's opinions

Williams's retained expert, Dr. Richard Ziernicki, has a bachelor's degree in mechanical design, a master's degree in mechanical engineering, and a Ph.D. in technical science.  He has served as principal engineer at Knott Laboratory, LLC for almost 30 years.  Dkt. 50-1 at 1 (PX-A).

In his expert report, Ziernicki disclosed the following opinions:

1.  Hand crush hazards, when operators are holding onto the rear overhead guard post while they are operating the forklift in

       reverse and looking in the direction of travel, are well known and recognized by industry leaders.

2. Hyster either knew or should have known of the hazards associated with operators holding onto the rear overhead guard post while they are operating the forklift in reverse and looking in the direction of travel.

3. Had the subject forklift been equipped with a standard rear drive handle, Mr. Williams'[s] injuries would have been mitigated.

4. Mr. Williams'[s] injuries were a result of the subject forklift not being equipped with the rear drive handle as a standard feature.

5. The cost to add a rear drive handle is insignificant and economically and technologically feasible.

6. Hyster failed to comply with engineering safety standards and designed an unreasonably dangerous and defective product without rear drive handle.

7. Hyster failed to warn operators of their forklifts of the hazard of hand crush if the operator placed their hand on the overhead guard and while operating their sitdown forklift in reverse.

Dkt. 50-2 at 7. Ziernicki based these opinions on the KTN Report, Dkt. 50-6, Hyster's corporate representative deposition, Dkt. 50-4, Hyster's own website and product manual, Dkt. 50-3, and numerous industry publications, regulations, and video evaluations, Dkt. 50-2 at 39-41. Ziernicki did not review other depositions in this case or conduct independent testing on the forklift involved in this incident. *See* Dkt. 50-5 at 16, 77-78 (PX-E). He has, however, inspected Hyster forklifts of the same model. *Id.* at 53 (Ziernicki deposition).

6

### D.     Procedural history

Williams sued Hyster in state court, asserting claims for strict products liability, negligence, and breach of the implied warranty of marketability.  Dkt. 1-5.  Hyster removed the case based on diversity jurisdiction.  Dkt. 1.

Near the close of discovery, Hyster filed a motion to exclude the opinions of Williams's retained expert witness, Dr. Richard Ziernicki, Dkt. 41, and a motion for summary judgment, Dkt. 42, to which Williams filed responses, Dkt. 45, 50.  Hyster sought and was granted leave to file a reply in support of its motion to exclude.  Dkt. 51, 52, 53.  The motions are ripe for review.

## Legal standard

### I.     Standard for motions to exclude expert opinions

> Under Federal Rule of Evidence 702,
>
> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if ... (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  To justify admitting an expert's testimony, the proponent of that testimony must show, by a preponderance of the evidence, "that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable."  *Stage Completions, Inc. v. Dissolvalloy, LLC*, 2021 WL 4888935,

at *1 (S.D. Tex. June 21, 2021); *see also Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

If an expert witness possesses the requisite qualifications to testify as an expert, the court must then assess the reliability and relevance of the expert's testimony.   The reliability inquiry examines "whether the reasoning or methodology underlying the testimony is scientifically valid." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993)).   For this determination, courts consider numerous non-exclusive factors: (1) "whether a theory or technique ... can be (and has been) tested"; (2) whether it "has been subjected to peer review and publication"'; (3) "the known or potential rate of error"; and (4) whether the approach is generally accepted within the relevant scientific community.  *See Daubert*, 509 U.S. at 593-94).   The inquiry, however, is "a flexible one" that focuses "solely on principles and methodology, not on the conclusions they generate." *Id.* at 594-95.   The ultimate decision whether to admit an expert's opinions lies in the district court's discretion.   *See Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 330 (5th Cir. 2010).

## II.   <u>Summary judgment standard</u>

Summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine 'if the evidence

8

is such that a reasonable jury could return a verdict for the nonmoving party.'" *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   A fact is material if the issue it addresses "could affect the outcome of the action." *Dyer v. Houston*, 964 F.3d 374, 379-80 (5th Cir. 2020) (citing *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010)).

When resolving a motion for summary judgment, courts must view the facts and any reasonable inferences "in the light most favorable to the nonmoving party." *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010) (internal quotation marks omitted).   "[T]he court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party …." *Union Pac. Res. Grp., Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 584 (5th Cir. 2001).   In addition, courts must credit all reasonable inferences from the evidence, without "weigh[ing] evidence or mak[ing] credibility findings." *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 476 (5th Cir. 2022) (citations omitted).   But "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Luna v. Davis*, 59 F.4th 713, 715 (5th Cir. 2023) (quoting *Brown v. City of Hous.*, 337 F.3d 539, 541 (5th Cir. 2003)).

9

<u>Analysis</u>

I.    <u>Reliability of Dr. Ziernicki's expert opinions</u>

In challenging the admissibility of Dr. Ziernicki's opinions, Hyster does not dispute Ziernicki's qualifications. Instead, Hyster contends that the bulk of Ziernicki's opinions are unreliable, namely: (1) that the forklift was defectively designed; (2) the alleged defect caused Williams's injuries; (3) including a grab handle, as a safer alternative design, would have prevented those injuries; and (4) Hyster provided inadequate warnings about the hand crush hazard. Dkt. 41 at 5.

     **A.**     **Dr. Ziernicki's opinions regarding defective design and causation.**

Under Texas law, a products liability claim based on an alleged design defect requires proof that "(1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery." *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009). A "safer alternative design" is a design "other than the one actually used," and that in reasonable probability:

     (a)     would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility and

     (b)     was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the

application of existing or reasonably achievable scientific knowledge.

Tex. Civ. Prac. & Rem. Code § 82.005(b).

### 1. Dr. Ziernicki's design defect opinions.

Dr. Ziernicki concluded that installing a rear-drive handle on the forklift—like the one Hyster offers as an option—was a safer alternative design that would have protected Williams's hand from being crushed against the plywood. Dkt. 50-5 at 69. As Ziernicki explained, a basic principle of design strives "to prevent injury in a case [in] which the injury [is] preventable," including to safeguard against hazards that cannot be eliminated. *Id.* at 60-61, 102-03, 124, 150-51. For forklifts, known hazards include the possibility that an operator would collide with an external object. *See id.* at 60-61, 124.

In addition, according to Ziernicki, the industry was aware of the risk that forklift operators would hold the rear post while driving in reverse. *Id.* at 57-59 (citing, *inter alia*, videos produced by various manufacturers). Unlike in a car, there is no second seat that a forklift operator can hold while rotating his body to look behind him. *Id.* at 74. So the operator will be tempted to grab ahold of the post "because it's convenient." *Id.* at 74, 80. Doing so exposes the hand to the risk of being crushed upon a collision. *Id.* at 116-18.

Dr. Ziernicki explained that a rear-drive handle protects against the risk of crushing injuries by placing the hand on the inward side of the operator's

11

compartment. *See id.* at 108. To that end, many manufacturers include rear-drive handles on their sit-down forklifts, including to provide crush protection. Ziernicki noted that Caterpillar, for example, includes those handles as standard equipment. *Id.* at 87-88, 105-06. And as Ziernicki emphasized, Hyster itself has referred to its optional handle as an "impact protection" device. *See id.* at 120, 122-23. The handle "move[s] your hand away from [the] crush zone" by placing it behind the rear post. *See id.* at 87-8, 108.

As for the particulars of Williams's accident, Ziernicki maintained that Williams's hand would not have been crushed had he been holding a rear-drive handle where Hyster installs one in its optional package. *Id.* at 120, 265. But Ziernicki did not calculate how high the plywood was. *See id.* at 40-41. He conceded that this calculation *could* be determined "very precisely," including based on evidence of blood and other biological material on the rear post where Williams's hand likely was crushed. *Id.* at 40-42. Yet Ziernicki admitted, "I haven't done that." *Id.* at 41.

Ziernicki also conceded that it was possible to test if a rear-drive handle would have shielded Williams's hand. *See id.* at 86-87. He had the dimensions and height of Hyster's rear-drive handle. *Id.* at 77-78. He simply dismissed the test as "trivial." *See id.* at 88. According to Ziernicki, the outcome would be "obvious" because "[i]f you had a hand located and protected by the post, there will be no crushing injury." *Id.* That is, Ziernicki opined, Williams's

hand would "never [have] come in contact with the board, the wooden plywood board." *Id.* at 88-89. But because Ziernicki did not take any measurements or undertake any calculations, there is no indication that Ziernicki determined how the location of impact on the plywood corresponded to the placement rear-drive handle that he maintains should have been installed.

Instead, Ziernicki declared that his specialized expertise enabled him to conclude—from photographs alone—that the manner in which the plywood was damaged indicates that Williams's hand would not have been crushed had he been holding a rear-drive handle installed in the same location as Hyster's optional feature. *See id.* at 89-91 ("I am trained to look at the photographs and understand what they show."). According to Ziernicki, the fact that the "plywood collapsed and came up and down and didn't curve around" indicated that the plywood would not have contacted a hand holding a rear-drive handle. *See id.* at 92, 100-01. But Ziernicki did not measure the dimensions of the rear-drive handle, compare it to the impact point on the plywood, or measure the size of Williams's hand. According to his testimony, Ziernicki "didn't need" those measurements. *See id.* at 99-100.

When asked if the collision could have been replicated, Ziernicki said no because there were too many variables, like the friction from the weight of other plywood stacked on top of the board, the speed of the forklift, and the specific angle of travel. *See id.* at 92-94. But Ziernicki eventually conceded it

was possible to run multiple tests at different angles, speeds, and orientations. *Id.* at 94.  Ziernicki did not review any such testing data, nor was he aware of any similar impact testing performed by another manufacturer.  *See id.* at 94-95, 101.  In any event, Ziernicki viewed such tests as irrelevant.  *Id.* at 94-95 ("No, I didn't bother to look for that because that's not relevant.").

2.  Dr. Ziernicki's opinion that the rear-drive handle would have prevented Williams's injury is conclusory and unreliable.

Hyster does not seriously dispute that Dr. Ziernicki had a sufficient basis to conclude that it was economically and technologically feasible to install a rear-drive handle.  After all, Hyster *itself* offers such a handle, and many other manufacturers include it as standard safety equipment.  *See Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 406 (5th Cir. 2016) ("[U]nder Texas law, a claimant can establish the technical feasibility of a safer alternative design by showing its use by others in the industry.").  Ziernicki also reliably concluded, based on industry videos and Hyster's own promotional materials, that the rear-drive handle safeguards against hand-crush injuries, in general.  *See* Dkt. 50-2 at 18-20, 24-26.

In addition, Hyster's disagreement with Ziernicki's account of the accident does not affect the admissibility of his testimony.  According to Hyster, the account of a passerby, Severo Garcia, suggests that Williams had extended his arm outside of the operator's compartment when the forklift collided with

14

the plywood.  *See* Dkt. 41 at 6-7 (citing Dkt. 41-8). But, as Ziernicki noted, KTN's accident report concluded that Williams was holding the right rear post when the forklift crushed his hand.  *See* Dkt. 50-5 at 95; Dkt. 50-6 at 11.  These disputes over competing versions of the facts go to the weight of Ziernicki's opinions, rather than their admissibility.  *See* Fed. R. Civ. P. 702, advisory comm. note to 2000 amendment ("The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.").

The rub here is whether Ziernicki applied a sufficiently reliable methodology to conclude that a rear drive handle, had it been installed, would have prevented or significantly reduced the risk of Williams's hand being crushed under the specific circumstances of *this* accident.  As Hyster argues, Ziernicki did not take any measurements, perform any calculations, or conduct any testing of this theory.  And Ziernicki admitted that he was unaware of any relevant testing done by other manufacturers.  Dkt. 50-5 at 94-95.

"Texas law expects that an alternative design be tested before a jury can reasonably conclude that the alternative would prevent or reduce the risk of injury."  *Casey v. Toyota*, 770 F.3d 322, 332 (5th Cir. 2014).  Problematically, Ziernicki provided nothing beyond speculation to show that grasping a rear-drive handle would have prevented Williams's crush injury.

Dr. Ziernicki did not measure the plywood nor compare it to the placement of Hyster's optional rear-drive handle.  If the handle were located well above or well below the contact point, then one might conclude that grasping the handle would have placed Williams's hand out of harm's way during the collision.  But Ziernicki appeared to assume that the impact occurred roughly at the height where the handle should have been placed.  *See* Dkt. 50-5 at 90.  Even in that scenario, Ziernicki insisted that "100 percent" of Williams's hand would have been shielded from the impact.  *See id.* at 100.

Other than invoking his qualifications and experience, Ziernicki derived his conclusion from photographs depicting how the plywood had splintered:



Dkt. 50-6 at 39-40 (cropped); *see also* Dkt. 50-5 at 91 (Ziernicki noting these photographs).  According to Ziernicki, "[t]he plywood was roughly perpendicular to the travel of the forklift.  So the first object coming into contact with that would be post, and the post would protect the handle, which

would be protected – by the post.  So plywood would never get into the area where the handle is."*Id*. at 90.

This statement is riddled with assumptions.  First, Ziernicki assumed that the handle would be recessed far enough from the exterior of the post that the plywood would have collided *solely* with the post, and not the hand.  But a photograph of Hyster's optional rear-drive handle shows little clearance between the operator's fingers and the outside of the post:



Dkt. 50-2 at 20 (cropped).  The larger the hand, the greater the likelihood that the operator's fingers would approach or even extend beyond the end of the post.  Contrary to logic, however, Ziernicki claimed it "doesn't matter whether [Williams's] hand is small or medium or large."  Dkt. 50-5 at 100.  Ziernicki did not take or consider any of these measurements.

Second, Ziernicki assumed that the upward movement of the plywood upon impact means that it would not have contacted a hand holding the rear-

drive handle.  But the photographs he referenced show that the forklift struck several inches from the right end of the plywood sheet, and the crushed area extends inward several inches:



Dkt. 50-6 at 39 (cropped).  This photograph suggests that the impact point was far enough from the right end of the plywood to strike not only the rear post, but also a handle on the right side of that post.  Rejecting that notion, Ziernicki testified that the "plywood has no evidence of wrapping around the post," which led him to conclude that the plywood "will not enter into [the] space where the handle and hand" would be.  *Id.* at 101.  But the penetration point extends numerous inches into the plywood.  The photo shows what appears to be blood where the forward impact stopped.[1]  And the damaged area extends numerous

---

[1] Ziernicki maintained that the photographs showed no evidence of blood on the plywood.  Dkt. 50-5 at 54.  But the photographs suggest otherwise.  *See* Dkt. 50-6 at 39.  Moreover, testimony of a KTN employee testimony confirms that there was blood on both the plywood and the post.  *See* Dkt. 41-5 at 6 ("The plywood sheet was a bit shifted.  There was some, of course, blood on it.").  Dr. Ziernicki did not review this testimony.  Dkt. 50-5 at 16.

inches across.  Yet Ziernicki did not take any measurements or conduct any tests to rule out the likelihood that a portion of the plywood would have struck the rear-drive handle.  And he identified no data supporting his bald statement that Williams's hand would have been protected "100 percent."  *See id.* at 100. Ziernicki's conclusory assertions do not pass muster under *Daubert*.

Two Fifth Circuit decisions are instructive.  In *Casey*, the court affirmed the exclusion of a design-defect expert, Renfroe, who lacked a sufficient basis to conclude that using a stronger material for a side curtain airbag would have prevented a driver from being ejected during an accident.  770 F.3d at 332-33. Renfroe had done no testing to support his conclusion.  *See id.* at 332. Significantly, too, the expert did not explain why the result would have differed "beyond simply asserting that the air bar would have stayed inflated in this accident."  *See id.*  Instead, Renfroe attempted to rely on tests performed during the application for a patent.  *See id.*  But those tests "did not involve similar forces and factors" and "were divorced from the conditions of this accident."  *Id.* at 332-33.

Later, in *Sims*, the Fifth Circuit affirmed the exclusion of an expert, Wallingford, who opined that the lack of a shield caused a vehicle's fuel tank to rupture.  *See* 839 F.3d at 406-08.  Wallingford reviewed photos and reports from the accident and "employed 'the laws of physics' and his own experience and education" to form his opinion.  *Id.* at 404.  Quoting *Casey*, the *Sims* court

noted an alternative design must be tested to determine if it would prevent or reduce the risk of injury. *See id.* at 407 & n.46. And this "testing can be as simple as applying math and physics to establish the viability of a design." *Id.* at 407. But Wallingford had no such basis for his opinions. Instead, Wallingford tried to extrapolate his conclusion from the opinions of a rebuttal expert who testified that law enforcement vehicles, which were often involved in collisions exceeding 100 miles per hour, were upgraded with fuel tank shields. *Id.* at 408. The Fifth Circuit found this methodology unreliable because that the rebuttal expert's testimony was too non-specific to lend the requisite support.

The lack of an adequate factual basis for Dr. Ziernicki's opinion is equally apparent. Ziernicki cited literature and industry videos that reflect awareness of hand-crush hazards, and ample evidence that rear-drive handles *generally* can reduce those hazards. *See* Dkt. 50-2 at 18-20, 24-26. On these issues, Ziernicki did not need to perform any further testing. *See James v. Cincinnati Inc.*, 243 F. App'x 25, 29 (5th Cir. 2007).[2]

---

[2] Williams cites *James* for the proposition that an expert need not conduct any testing when the safer alternative design is widely available on the market. *See* Dkt. 50 at 7. Contrary to Hyster's assertion, *James*'s application of *Daubert*'s federal standard for expert testimony is relevant despite its application of Mississippi law to the merits of the underlying claim. *James* does not, however, address the critical question here of whether the asserted defect caused the plaintiff's injury. *See* 243 F. App'x at 29 (holding that testing was unnecessary to determine the feasibility of an alternative design that the industry had already adopted).

But that does not relieve Ziernicki of his obligation under *Daubert* to identify data supporting his opinion that a rear-drive handle would have changed the outcome in *this* accident.  Yet Ziernicki made no calculations and took no measurements.  He had not reviewed any impact-testing data, nor was he aware if such testing had been done by another manufacturer.  *See* Dkt. 50-5 at 94-95, 101.  And despite agreeing it was possible to test for impacts at different angles, speeds, and orientations, Ziernicki did not perform any such tests.  *See id.* at 94.

In essence, Ziernicki simply declared—despite failing to take measurements and account for variables like speed or force of the impact, the strength of the plywood material, or even the location of the impact—that the plywood would not have struck a hand holding a rear-drive handle.  This is classic, inadmissible *ipse dixit*.[3]  *See Kumho Tire*, 526 U.S. 137, 157 (1999) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136,

---

[3] Indeed, Dr. Ziernicki's opinions have been excluded for similar failures to provide adequate substantiation.  *See, e.g.*, *Smith v. Cangieter*, 462 F.3d 920, 924 (8th Cir. 2006) (affirming exclusion where "Ziernicki did not present accident data, produce tests performed by others, or perform his own mathematical calculations"); *Hauck v. Michelin N. Am., Inc.*, 343 F. Supp. 2d 976, 986 (D. Colo. 2004) ("[T]he opinion and testimony of Dr. Ziernicki is not sufficiently supported by reliable technical or scientific reasoning, is not supported by literature in the field or test results ....").

146 (1997)); *see also, e.g.*, *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 906 (Tex. 2004) (expert's invocation of laws of physics, without supporting studies or tests, rendered his causation opinion legally insufficient). Ziernicki's design-defect opinions that a rear-drive handle would have prevented Williams's injury should be excluded.

### B.   Dr. Ziernicki's failure to warn opinion.

Hyster argues that Dr. Ziernicki's opinion regarding the inadequacy of any warnings is admissible. Dkt. 41 at 13. According to Hyster, Ziernicki offered no alternative warning or instruction that would have prevented or reduced the risk of Williams's injury. *See id.* Instead, Ziernicki took the position that warnings would not have made a difference in this case. *See* Dkt. 50-5 at 154. Williams does not address these issues. *See generally* Dkt. 50.

In his report, Ziernicki opined that "Hyster failed to warn operators of their forklifts of the hazard of hand crush if the operator placed their hand on the overhead guard and while operating their sitdown forklift in reverse." Dkt. 50-2 at 38. But during his deposition, Ziernicki testified "I personally don't believe that a problem of this type of [hand-crush] injury ... can be solved by warning." Dkt. 50-5 at 154. Instead, Ziernicki maintained that warnings are a "last resort." *See* Dkt. 50-5 at 103. And because Ziernicki opined that a rear-drive handle is a feasible alternative to guard against the hazard, he

"wouldn't rely on warning[s]." *Id.* at 154; *see also id.* at 156 ("Warning[s] [are] not replacement[s] for guarding.").

Ziernicki's own testimony reflects that his opinion regarding inadequate warnings is irrelevant to this case. Causation is an essential element of any claim premised on a failure to warn. *See, e.g.*, *Syrie v. Knoll Int'l*, 748 F.2d 304, 307 (5th Cir. 1984) (negligence requires proof that the manufacturer's "breach of duty was a proximate cause of the injury"); *Baksic v. Ethicon Inc.*, 659 F. Supp. 3d 763, 769 (W.D. Tex. 2023) (explaining that "failure to warn claims based both in negligence and in strict liability involve the same 'essential question [of] whether an inadequate warning caused the plaintiff's injuries'") (quoting *Sprankle v. Bower Ammonia & Chem. Co.*, 824 F.2d 409, 413-14 (5th Cir. 1987)). At most, Ziernicki testified that a "warning doesn't hurt" and that manufacturers should place warning labels on forklifts to eliminate some injuries. *See* Dkt. 50-5 at 154-55, 157. But he maintained that a warning would not have prevented Williams's injury. *See id.* at 154. Ziernicki's stance that no warning would have made a difference is therefore irrelevant and inadmissible in this case. *See Daubert*, 509 U.S. at 591 (expert testimony that is irrelevant is not helpful to the case under Rule 702); *Gomez v. Am. Honda Motor Co.*, 2015 WL 1875954, at *7 (Tex. App.—San Antonio Apr. 22, 2015, pet. denied) (holding expert testimony about the adequacy of warnings would

not be helpful to the jury "because the basis of [the expert's] opinion was that *no* warning would have prevented the accident at issue").

## II.   Hyster's motion for summary judgment should be granted.

"In Texas, a plaintiff can predicate a products liability action on one or more of at least three theories of recovery: (1) strict liability under [Restatement (Second) of Torts] § 402A, (2) breach of warranty under the U.C.C., and (3) negligence." *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 423 (Tex.1984)." Hyster has moved for summary judgment on all three of these causes of action.[4] *See* Dkt. 42. As concluded above, Dr. Ziernicki's testimony— that the handle would have prevented Williams's injuries and that Hyster failed to warn of the hazard—is inadmissible. *See supra* Part I. This leaves Williams with no evidence supporting his negligence and strict liability claims. In addition, Williams did not purchase the forklift, which bars his implied warranty claim. Hyster's motion for summary judgment should be granted.

### A.   Williams's objections to the evidence.

As an initial matter, Williams's global request that the Court preserve the objections made during deposition and strike the objectional portion from the record is improper. Dkt. 45 at 3. "Federal Rule of Evidence 103(a)(1) requires an objecting party to make specific objections detailing the specific

---

[4] Williams's request for continuance is moot because his requested November 2023 deadline has passed. *See* Dkt. 45 at 4.

evidence the party wishes to have stricken and stating the specific grounds upon which each piece of evidence should be stricken." *Wimberley v. Beast Energy Servs., Inc.*, 2022 WL 658717, at *4 (S.D. Tex. Mar. 4, 2022) (citing Fed. R. Evid. 103(a)(1)), *adopted by* 2022 WL 836427 (S.D. Tex. Mar. 21, 2022). "Objections lacking specificity do not satisfy the requirements of Rule 103." *Id.* (citing *United States v. Polasek*, 162 F.3d 878, 883 (5th Cir. 1998)). Williams's non-specific, global objection is overruled.

Williams also objects to the unsworn statement from Severo Garcia as hearsay. Dkt. 45 at 3. As noted above, Mr. Garcia is a KTN employee who "glimpse[d]" Williams's accident. He submitted a handwritten report to the employer, KTN, describing what he saw. Dkt. 50-6 at 62. Hyster offers the Garcia Memo for its truth, to assert the positioning of Williams's hand at the time of the accident. Dkt. 42 at 9. The statement does not fall under any exceptions to the hearsay rule. Moreover, despite efforts on both sides, the parties have been unable to locate or further interview Garcia. They believe he may be deceased. *See* Dkt. 50 at 15 & n.6. The Court sustains Williams's hearsay objection.

**B.      Exclusion of Dr. Ziernicki's testimony forecloses Williams's negligence and strict liability claims.**

Without Dr. Ziernicki's testimony, Williams cannot raise a genuine issue of material fact on his negligence and strict liability claims.  For this reason alone, summary judgment is appropriate.

Williams's strict products liability claim requires him to show that the forklift's defective design "was a producing cause of [his injury] ...." *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009) (citing *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 256-57 (Tex. 1999) and Tex. Civ. Prac. & Rem. Code § 82.005(a)).  Expert testimony "is crucial" this element.  *Sims*, 839 F.3d at 409 (affirming summary judgment in favor of manufacturer where plaintiff's design-defect expert was properly excluded).

Williams tries to suggest that he has established causation as a matter of law.  Dkt. 45 at 6.  This position confuses two different causation inquiries.  At most, Williams has shown, through Dr. Ziernicki's admissible opinions, that a safer alternative design existed.   But the statute requires that implementation of that safer alternative design "would have prevented or significantly reduced the risk of *the claimant's* personal injury."  Tex. Civ. Prac. & Rem. Code § 82.005(b) (emphasis added).  Yet Williams presented no reliable opinions that a rear-drive handle would have prevented or reduced the risk of Williams's hand injury.  *See supra* Part I.A.2.  Other than Dr. Ziernicki's

26

inadmissible testimony, the only evidence Williams cites is the KTN report, which states "this forklift facilitates to hold the pole while driving in reverse." *See* Dkt. 45 at 10 (citing Dkt. 45-7 at 66).[5]   But nothing in the KTN report states that a handle would have prevented Williams's injuries.   Without such proof, Williams's strict liability claim fails.

Williams's lack of causation evidence also defeats his negligence claim. "To prove a products liability claim premised upon a theory of negligence, a plaintiff must demonstrate: (1) that the manufacturer owed a duty to the plaintiff; (2) that the manufacturer breached that duty; (3) that the plaintiff was injured: and (4) that the manufacturer's breach of the duty was the proximate cause of the plaintiff's injury or damages."   *McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403, 431 (5th Cir. 2001) (citing *Syrie*, 748 F.2d at 307).   Hyster allegedly breached its duty by not implementing the rear-drive handle as a standard safety device.   Even assuming this is true, the exclusion of Ziernicki's opinions leaves Williams with no evidence that the lack of a rear-drive handle proximately caused his injury.

Likewise, Williams's negligence theory premised on inadequate warnings fails for lack of admissible causation testimony.   As noted above,

---

[5] The KTN report also identifies Williams's failure to follow instructions as a root cause of the accident.   Dkt. 45-7 at 66 (reporting that Williams was "not respecting general driving instruction – habit – risk awareness").

Ziernicki *negated* the notion that a different warning would have prevented Williams's injury.  *See supra* Part I.B.  The negligence claim is barred.

### C.    Williams cannot recover on his implied warranty claim.

Williams does not address his remaining claim for breach of the implied warranty of merchantability.  A claim for breach of the implied warranty of merchantability requires showing "1) the defendant sold or leased a product to the plaintiff; 2) the product was unmerchantable; 3) the plaintiff notified the defendant of the breach; and 4) the plaintiff suffered injury." *Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 867 (Tex. 2007) (quoting *Polaris Indus. v. McDonald*, 119 S.W.3d 331, 336 (Tex. App.—Tyler 2003)).  As Hyster correctly asserts, KTN—not Williams—purchased the forklift.  *See* Dkt. 42 at 12; *see also* Dkt. 45-2 at 8 (Dr. Ziernicki's report noting this undisputed fact).  This precludes Williams's warranty claim.  Summary judgment is warranted on all of Williams's claims.

### <u>Recommendation</u>

For the foregoing reasons, it is **RECOMMENDED** that Defendant Hyster-Yale Group's motion to exclude the expert opinions of Dr. Richard Ziernicki, PhD. (Dkt. 41) be **GRANTED** as to Dr. Ziernicki's opinions (1) that installation of a rear-drive handle on the forklift would have mitigated or prevented Williams's injuries; and (2) that Hyster improperly failed to warn about the hand-crush injury.

It is further **RECOMMENDED** that Hyster's motion for summary judgment (Dkt. 42) be **GRANTED**, and that a final judgment be entered, pursuant to Fed. R. Civ. P. 58(a), stating that Williams shall take nothing on his claims.

**The parties have fourteen days from service of this Report and Recommendation to file written objections.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.  *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 825 (5th Cir. 2015).**

Signed on February 9, 2024, at Houston, Texas.

Yvonne Y. Ho
United States Magistrate Judge